# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOSEPH MICHAEL MARTIN,

    Defendant.

Case No. 18-CR-40117-HLT

## MEMORANDUM AND ORDER

Defendant is charged with conspiracy to possess with intent to distribute five or more kilograms of cocaine and knowingly and willfully transporting $1,124,840 as proceeds of the conspiracy. He moves to suppress the evidence found during the traffic stop of the truck he was driving. Doc. 20. He argues law enforcement violated his Fourth Amendment rights by drilling holes in the metal tube in the bed of his truck. Because the information gathered by law enforcement during the consensual portion of the search provided probable cause to support a search of the metal tube without consent, no Fourth Amendment violation occurred. Accordingly, the Court denies Defendant's motion.

## I. BACKGROUND[1]

On September 20, 2018, at approximately 8:20 a.m., Trooper Justin Rohr (who had been trained on drug interdiction and had spent two weeks at the San Ysidro Port of Entry working with border patrol and learning concealment methods, techniques, and current trends) stopped a 2016

---

[1] During the October 10, 2019 hearing on Defendant's motion to suppress, the Court heard testimony from the two Kansas Highway Patrol troopers involved in the September 20, 2018 traffic stop: Trooper Justin Rohr and Trooper Dylan Frantz. Based on the troopers' demeanor and attentiveness during questioning—and given that, at times, the troopers conceded facts not helpful to the government's case—the Court credits their testimony in its entirety but relays only those portions relevant to its resolution of the presented issues.

GMC pickup truck on I-70 for speeding. As he approached the passenger side window, he observed old hoses, electrical wire, and five 6 ft. x 6 in. x 3 in. metal tubes in the truck bed. Defendant handed him an Ohio license and explained he was heading to California to look at a Suzuki Hayabusa motorcycle. He appeared to have been traveling all night, as his eyes were bloodshot, and he had coffee and Red Bull in the cupholders. There were two air fresheners in the truck giving a strong odor. Trooper Rohr saw that Defendant had only a small duffle bag in the back seat. He asked if Defendant was going to load the motorcycle into the back of the truck, and Defendant answered in the affirmative. Trooper Rohr did not think loading a motorcycle in the bed of the truck was feasible given the pipes and hoses.

Trooper Rohr returned to his patrol car and began issuing a warning while checking Defendant's license and criminal history. Defendant had no criminal history. He then returned to the truck, explained the warning, and told Defendant to have a safe trip. He walked back towards his patrol car but then reapproached Defendant and asked whether he could ask Defendant some questions. Defendant replied "sure."

Trooper Rohr then learned Defendant was an unemployed truck driver who was shopping for a $16,000 motorcycle, which was "cheap" because it had "special stuff" on it. Defendant had recently purchased the truck in California for $32,000. He was from Cleveland, Ohio, and was going to an unknown area outside Los Angeles, California. The stay would be for a couple of days depending on what happened, which Trooper Rohr considered to be a quick return for a thirty-four- to thirty-six-hour drive across the country. Defendant was not sure what the quickest route to his destination was; he just decided on this route. In addition, Trooper Rohr knew I-70 is a drug corridor and that I-80 would have been the quicker route. Defendant had only a motorcycle

operator's permit, not a license. Based on these facts, Trooper Rohr did not think the trip to purchase a motorcycle was reasonable, even if it was a good deal.

Trooper Rohr advised Defendant that law enforcement was seeing a large amount of criminal activity on I-70 and that he wanted to make sure Defendant did not have anything illegal in the truck. He asked Defendant if there were large amounts of money in the vehicle, and Defendant told him $1,500. Trooper Rohr asked if there were any drugs, and Defendant said "no." Finally, Trooper Rohr asked to search the vehicle, to which Defendant replied "sure." Trooper Rohr asked Defendant to exit the truck and stand by the front of the truck.

Trooper Rohr had a narcotics detection dog with him but declined to perform a dog sniff. Instead, he searched the truck's interior and found three rubber-banded bundles of cash, which appeared to be more than $1,500. He also saw that the ends of the old hoses in the truck bed were so rusted that they were useless and that the metal tubes were strapped together. Based on the appearance, he thought the hoses were staged. He used a density meter on all five tubes and did not think the reading was high enough for something to be inside.

Trooper Dylan Frantz arrived, and saw that Defendant appeared to be overwhelmed with worry and nervousness, shaking his head, looking down, and talking to himself. He commented to Trooper Rohr, and Trooper Rohr said that Defendant was fine earlier. Trooper Frantz asked Defendant about the tubes. Looking down, Defendant explained he was going to use the tubes as supports for his porch but was too lazy to take them out for the trip. In discussing Defendant's response, the troopers commented to each other that the story made no sense. They then lifted one of the metal tubes and felt something slide inside. They felt movement as they shook it leading them to believe the tubes were hidden compartments for something illegal. They noticed that the tubes had metal caps that appeared to have been welded on multiple times and were freshly painted.

Trooper Rohr retrieved a small drill and drilled two holes in the cap of one tube and saw pink fiberglass insulation, which did not accord with Defendant's stated purpose for them. The troopers knew there had to be something heavier in the tube and guessed bundles of money. But they could not access it without grinding off the cap. Defendant, who was directed to stand twenty yards in front of the truck at this point, never objected to the drilling.

The troopers handcuffed and *Mirandized* Defendant and took him and the truck to a station.[2] Before leaving the side of the highway, however, Trooper Rohr learned that Defendant did not know the name of the person selling the motorcycle or where he lived; it was all on Facebook. Defendant bought the truck from a woman named Tammy. He could not remember her last name. Along the way, Defendant said he had welded the tubes in the back of his truck a couple of days earlier, that he was teaching himself, and that there was nothing in the tubes. Upon arriving at the station, Defendant was able to observe the troopers grinding the caps off and discovering $1.1 million in red plastic bundles. The troopers concealed the bundles in a box, and Trooper Rohr's dog alerted to it. The troopers found cocaine in a contact lens case that was in one of the plastic bundles.

Based on the evidence collected, a grand jury indicted Defendant on December 12, 2018, for conspiracy to possess with intent to distribute five or more kilograms of cocaine and knowingly and willfully transporting $1,124,840 as proceeds of the conspiracy. Doc. 1. Defendant now moves to suppress the evidence found in the tubes.

## II. ANALYSIS

Defendant contends the troopers violated his Fourth Amendment rights when they drilled two holes in the metal tube. Defendant concedes that he consented to a search of his entire truck

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

but nevertheless contends that this consent did not include permission to drill the holes in the metal tube.

The fact that Defendant may not have consented to the drilling (an issue the Court does not decide) does not necessitate suppression of the contraband if there is another valid basis justifying the intrusion. It is well settled that a vehicle may be searched without consent or a warrant if there is probable cause to believe that it contains contraband or other evidence that is subject to seizure under law. *United States v. Ross*, 456 U.S. 798, 809 (1982). Probable cause exists when the totality of the circumstances warrants a reasonable person in believing contraband or evidence of a crime is present. *Florida v. Harris*, 568 U.S. 237, 243 (2013). A vehicle search conducted pursuant to probable cause may include any item or component in the vehicle that might contain the object of the search. *Ross*, 456 U.S. at 821-24 & n.28. And such a search may include some injury to the vehicle or item if the injury is reasonably necessary to gain access to a specific location where law enforcement has probable cause to believe that the object of the search is located. *Id.* at 817-18.

There is no dispute that Trooper Rohr lacked probable cause to drill the holes when he initiated the consensual search. The proper scope of his search was therefore constrained by a reasonable interpretation of Defendant's statement of consent. *See United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007) (discussing scope of consensual search). Based on his earlier observations and acting reasonably within the scope of consent, Trooper Rohr examined the metal tubes, felt something move inside, and noticed the welding and painting. The Court finds that the totality of the information gathered by Trooper Rohr while he was engaged in a permissible consensual search provided the probable cause necessary to extend the search to drilling the holes. *See United States v. Ledesma*, 447 F.3d 1307, 1315-18 (10th Cir. 2006) (holding officers can use

information gleaned while within the scope of a suspect's consent to establish probable cause to expand the search beyond the scope of consent).

The most significant factor is the evidence of a hidden compartment in the metal tube. The troopers felt something move in the metal tube and noticed evidence of tampering with the tube. The movement of something in the tube was incongruent with Defendant's statement that the tube was a support. And the tube had evidence of tampering as the cap on the tube looked like it had been welded on multiple times and recently painted. Based on these observations and his training and experience, Trooper Rohr believed the tubes were portable hidden compartments. Because there was highly probative evidence that the tube was a hidden container and because the Court cannot imagine a licit purpose for a hidden storage compartment in the metal tube (Ex. 3), the Court finds this evidence strongly suggests probable cause to drill the holes. *See Ledesma*, 447 F.3d at 1318 (holding the highly probative evidence of a secret compartment, for which it was difficult to imagine a licit purpose, "strongly suggest[ed]-and perhaps even singlehandedly" established probable cause to pry open a van's panels); *see also Lyons*, 510 F.3d at 1241 (holding an officer had probable cause to cut open a suspicious spare tire based on his experience and echo test results consistent with the presence of contraband).[3]

Any remaining doubt about probable cause is resolved by the other facts. Defendant was traveling across country at 8:20 a.m. with bloodshot eyes and in a truck with two air fresheners. The short duration of the trip coupled with the fact that he appeared to have driven overnight is

---

[3] Defendant calls the tubes "containers in plain view," but that is not how Defendant presented them during the traffic stop. Contrary to Defendant's contention, the Court is not "atomiz[ing] Fourth Amendment protections to permit the search of any container with contents." Doc. 33 at 6-7. It is the covert nature of the containers combined with Defendant's claim that there were supports that contributes to the finding of probable cause. People do not transport licit items in welded, metal tubes, much like they do not transport licit items in spare tires. *See State v. Rodriguez*, 203 P.3d 89, at *2 (Kan. Ct. App. 2009) (finding that, for probable cause purposes, "there is a clear distinction between securing something in a container that is obvious to all and hiding something in a secret compartment").

incongruent with him not taking the most efficient travel route. His plan to purchase a $16,000 motorcycle after recently purchasing a $32,000 truck is inconsistent with his unemployment status. He had minimal luggage, had only a motorcycle permit, and had bundles of rubber-banded money (a drug-trafficker characteristic) totaling more than he stated. Defendant went from "fine" to looking down, shaking his head, and talking to himself while the troopers searched his truck. Finally, the tubes were unlikely supports and the hoses were useless and appeared to be staged. Bringing a motorcycle back in the truck with the tubes and useless hoses did not make sense and was infeasible. Based on all of the circumstances, the Court finds that Trooper Rohr had the probable cause necessary to extend the search to drilling the holes. By drilling the holes, the troopers obtained more evidence supporting probable cause (fiberglass insulation) and justifying their subsequent actions of grinding off the cap of the tube. And the evidence found after grinding off the first cap (money) justified their actions of grinding off the other caps.

Defendant marches through an eleven-point argument contending that each piece of evidence contributing to the probable cause analysis has little to no probative value. The Court agrees that some of the evidence in isolation has little to no probative value. *See Vasquez v. Lewis*, 834 F.3d 1132, 1137 (10th Cir. 2016). But the Court examines the evidence in the aggregate. *See Ledesma*, 447 F.3d at 1316 (noting that courts are not concerned with facts in isolation but what they indicate in the aggregate). And, based on the totality of above-stated evidence, the Court finds that the troopers had probable cause to first drill into, and then grind off, each tube's cap.

THE COURT THEREFORE ORDERS that Defendant's motion (Doc. 20) is DENIED.

IT IS SO ORDERED.

Dated: December 6, 2019 /s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE